## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| EMPIRE TECHNOLOGY DEVELOPMENT LLC | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. _____ |
| NVIDIA CORPORATION, and | § § | JURY TRIAL DEMANDED |
| NVIDIA SINGAPORE PTE. LTD., | § § | |
| Defendants. | § § | |

### PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Empire Technology Development LLC ("Empire" or "Plaintiff") files this Complaint for patent infringement against NVIDIA Corporation and NVIDIA Singapore Pte. Ltd. (collectively, "NVIDIA" or "Defendants"). Plaintiff alleges infringement of United States Patent Number 8,694,704 ("'704 Patent" or the "Asserted Patent").

### NATURE OF SUIT AND BACKGROUND

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

2.      In approximately 2007, two graduate research assistants at the University of Texas at Austin—Daniel Gratz and Boris Grot—and their professor, Dr. Keckler, recognized a problem with congestion in computer microprocessor networks that ultimately slowed down the speed at which a processor could work. These individuals sought to develop improved adaptive routing techniques for computer networks to solve this problem and open a new age of computing power. They observed that interconnection networks at the time were either oblivious to congestion or

relied on local congestion information. To improve load balancing, they proposed a new technique they called Regional Congestion Awareness (RCA), which (among other things) can inform the routing policy of congestion in parts of the network beyond adjacent routers. Further research demonstrated that the RCA technique resulted in a 16% average and 71% maximum latency reduction. Their paper was published in the Proceedings of the 14th International Symposium on High-Performance Computer Architecture, and, ultimately, the '704 Patent was granted in recognition of the value of their invention. The invention of the '704 Patent is particularly important for massive computing tasks—such as next-generation data centers and Artificial Intelligence. Since the development of RCA, both graduate research assistants earned their PhDs and became accomplished professors in their own right.

3.     Based on the success of their research, the University of Texas took steps to protect the invention with patents. To do so, the University of Texas partnered with Plaintiff's predecessor, then called Innovation Development Management Company, LLC ("IDMC").  IDMC became the exclusive licensee of the invention and managed the patenting and development of the invention on behalf of the University of Texas. Ultimately, the efforts of Dr. Gratz, Dr. Grot, and Dr. Keckler were rewarded with issuance of the '704 Patent.  After the invention that led to the '704 Patent, Dr. Keckler was hired to work at NVIDIA, where he now leads the Architecture Research Group.

4.     As discussed further below, in approximately 2023, NVIDIA released a new product—the Grace CPU. The Grace CPU implements the congestion awareness techniques protected by the '704 Patent. NVIDIA's CEO and founder highlights the benefits provided by the technology of the '704 Patent in promoting the Grace chips, explaining, "[..]almost every single data center is now powered limited, and we designed Grace to be extraordinarily performant in a power-limited environment. . . [a]nd in that case, you have to be both really high in performance,

and you have to be really low in power, and just incredibly efficient. And so, the Grace system is about two times more power/performance efficient compared to the best of the latest generation CPUs."[1] He also explained that the Grace CPU superchip specifically offers "the highest performance, memory bandwidth and NVIDIA software platforms in one chip and will shine as the CPU of the world's AI infrastructure."[2] But NVIDIA does not have a license to practice the '704 Patent. Accordingly, Empire brings this action to enforce the exclusive rights provided by the '704 Patent and to recover damages appropriate to compensate for NVIDIA's unlicensed use of the claimed invention.

## THE PARTIES

### Empire Technology Development LLC

5.      Empire is a limited liability company duly organized and existing under the laws of Delaware. Empire is the current exclusive licensee of and has all substantial rights in and to the '704 Patent, including the right to sue for damages.

### NVIDIA

6.      Defendant NVIDIA Corporation is a Delaware corporation. NVIDIA Corporation is registered with the State of Texas and may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. NVIDIA maintains a physical facility within this District at 11001 Lakeline Boulevard, Suite #100, Building 2, Austin, Texas 78717.

7.      Defendant NVIDIA Singapore Pte. Ltd. ("NVIDIA Singapore") is an entity organized under the laws of Singapore with a place of business located at 3/F Harbour View 1,

---

[1] https://www.tomshardware.com/news/nvidia-ceo-jensen-huang-grace-delay

[2] https://nvidianews.nvidia.com/news/nvidia-introduces-grace-cpu-superchip

No. 12 Science Park East Avenue, HK Science Park, Shatin, Hong Kong. NVIDIA Singapore Pte. Ltd. is a wholly owned subsidiary of NVIDIA International, Inc. On information and belief, NVIDIA Singapore may be served at its registered office located at 6001 Beach Road, #15-01, Golden Mile Tower, Singapore 199589, or through an officer or a managing or general agent located in the United States.

8.    Defendants NVIDIA Corporation and NVIDIA Singapore make, use, offer for sale, sell, and/or import into the United States products that practice the claimed inventions of the '704 Patent, including at least NVIDIA Grace CPUs and products containing NVIDIA Grace CPUs ("Accused Products"). For example, NVIDIA Grace CPUs are included in the NVIDIA GH200 Grace Hopper Superchip, NVIDIA Grace Blackwell Superchips, and the NVIDIA Grace CPU Superchip, among other products sold by NVIDIA and others. These products are, in turn, incorporated into datacenter products (for example, the NVIDIA GB200 NVL72 and NVIDIA DGX GH200), computers (for example, the NVIDIA DGX Spark and NVIDIA DGX Station) and cloud services (for example, on NVIDIA DGX Cloud[3] or NVIDIA AI Enterprise[4]), among other products and services offered by NVIDIA and others.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338, as those claims arise under the patent laws of the United States (35 U.S.C. §§ 1 *et seq*.).

### NVIDIA Corporation

10.    NVIDIA Corporation is subject to this Court's personal jurisdiction consistent with

---

[3] https://www.nvidia.com/en-us/data-center/dgx-cloud/gb200/notify-me/

[4] https://www.nvidia.com/en-us/data-center/products/ai-enterprise/

the principles of due process and/or the Texas Long Arm Statute. NVIDIA conducts substantial business in Texas and in this District, including through its regional office at 11001 Lakeline Blvd., Suite #100 Bldg. 2, Austin, Texas 78717.

11.     Personal jurisdiction exists generally over NVIDIA Corporation because NVIDIA Corporation has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within Texas, including in the Western District of Texas. For example, on information and belief, NVIDIA Corporation has committed, and continues to commit patent infringement in the State of Texas and this District; NVIDIA Corporation purposefully availed itself of the privileges of conducting business in the State of Texas and this District; and NVIDIA Corporation regularly conducts and solicits business—including substantial marketing and sales of products—within the State of Texas and this District. As such, personal jurisdiction over NVIDIA Corporation in this action comports with due process such that an exercise of personal jurisdiction over NVIDIA Corporation would not offend traditional notions of fair play and substantial justice.

12.     On information and belief, NVIDIA Corporation employees in this District design, develop, market, and/or sell the Accused Products, including from NVIDIA Corporation's offices in Austin.

13.     Personal jurisdiction also exists over NVIDIA Corporation because NVIDIA Corporation, directly or through subsidiaries, agents, representatives, or intermediaries makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products and/or services including the Accused Products within Texas, including in the Western District of Texas, that infringe one or more claims of the Asserted Patent. Further, on information and belief, NVIDIA Corporation has placed or contributed to placing infringing products and/or services sold

and used in this District.

14.     For fiscal year 2024, NVIDIA Corporation reported USD 26.966 billion in revenue from sales to customers in the United States. On information and belief, a substantial portion of NVIDIA's recent success and reported revenue is attributable to the demand for the Accused Products.[5]

15.     For example, NVIDIA Corporation offers for sale and/or sells the Accused Products directly to customers in the United States, including in this District, through its official online marketplace, marketplace.nvidia.com, which allows consumers, businesses, and other end users throughout the United States and this District to reserve or purchase the Accused Products, such as the NVIDIA DGX Spark.

---

[5]  https://nvidianews.nvidia.com/news/nvidia-announces-financial-results-for-fourth-quarter-and-fiscal-2025



16.     NVIDIA Corporation has direct customers, such as add-in board ("AIB") manufacturers, distributors, original device manufacturers ("ODMs"), original equipment manufacturers ("OEMs"), and system integrators, who purchase products directly from NVIDIA Corporation. On information and belief, at least some of NVIDIA Corporation's direct customers reside and/or operate within this District.

17.     For example, NVIDIA partnered with Digital Realty to provide NVIDIA DGX-Ready data centers. On information and belief, one of those data centers is located at 7500 Metro Center Drive, Austin, TX 78744.[6]

18.     Having purposefully availed itself of the privilege of conducting business within

---

[6] https://www.digitalrealty.com/partners/nvidia.

this District, NVIDIA Corporation should reasonably and fairly anticipate being brought into court here. Indeed, NVIDIA Corporation has repeatedly acknowledged that this Court has personal jurisdiction over it. *See, e.g., Vantage Micro LLC v. NVIDIA Corp.*, No. 6:19-cv00582-RP, Dkt. 22 (W.D. Tex., Jan. 4, 2020) (admitting to personal jurisdiction); *Ocean Semiconductor LLC v. NVIDIA Corp.*, No. 6:20-cv-01211-ADA, Dkt. 14 at ¶ 27 (W.D. Tex., Mar. 12, 2021) (same); *SiliconArts Technology US Inc. v. NVIDIA Corporation et al.,* No. 1:25-cv-00431, Dkt. No. 36.

19.     Venue is proper in the Western District of Texas pursuant to 28 U.S.C. §§ 1391(b)-(c) and/or 1400(b). NVIDIA Corporation has committed acts of infringement in this District and has a regular and established place of business in this District, including its physical office on Lakeline Boulevard in Austin, Texas.

20.     On information and belief, NVIDIA Corporation also owns and operates the Accused Products with Grace CPU in this District, including at 7100 Metropolis Drive, Austin, Texas, 78744.

21.     NVIDIA Corporation's locations in this District are regular and established places of business under 28 U.S.C. § 1391, 28 U.S.C. § 1400(b), and *In re Cray, Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).

22.     In addition, NVIDIA Corporation has not disputed that venue is proper in this District in cases filed against it in this District. *See, e.g., Vantage Micro LLC v. NVIDIA Corp.*, No. 6:19-cv-00582, Dkt. No. 22; *Ocean Semiconductor LLC v. NVIDIA Corp.*, No. 6:20-cv-01211-ADA, Dkt. 14; *Polaris Innovations Ltd. v. Dell Inc. et al*., No. 5:16-cv-00451, Dkt. No. 19; *Cirrus Logic, Inc. v. ATI Techs.*, et al., No. 1:03-cv-00302, Dkt. No. 6; *SiliconArts Technology US Inc. v. NVIDIA Corporation et al.,* No. 1:25-cv-00431, Dkt. No. 36.

**<u>NVIDIA Singapore</u>**

23.     NVIDIA Singapore is subject to this Court's personal jurisdiction consistent with principles of due process and/or the Texas Long Arm Statute. Personal jurisdiction exists over NVIDIA Singapore because NVIDIA Singapore, directly or through parents, subsidiaries, agents, representatives, or intermediaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products and/or services within Texas, including in the Western District of Texas, that infringe one or more claims of the Asserted Patent. Further, on information and belief, NVIDIA Singapore has placed or contributed to placing infringing products and/or services into the stream of commerce knowing or understanding that such products and/or services would be sold and used in this District.

24.     Furthermore, personal jurisdiction over NVIDIA Singapore in this action comports with due process such that an exercise of personal jurisdiction over NVIDIA Singapore would not offend traditional notions of fair play and substantial justice. For example, NVIDIA Singapore has sought protection and benefit from the laws of the State of Texas by placing infringing products into the stream of commerce through an established distribution channel with the awareness and/or intent that they will be purchased by consumers in this District. Having purposefully availed itself of the privilege of conducting business within this District, NVIDIA Singapore should reasonably and fairly anticipate being brought into the court here.

25.     On information and belief, NVIDIA Singapore is a wholly owned subsidiary of NVIDIA Corporation and operates primarily as a billing and invoicing hub for large enterprise and hyperscale customers, including some companies headquartered in the United States. NVIDIA Singapore has purposefully directed its activities at the United States, including Texas.

26.     In Fiscal Year 2025, NVIDIA Corporation reported 130.5 billion USD of total revenue. NVIDIA Corporation reports that, based on customer billing location, 61.3 billion USD

(roughly 47%) of its total revenue is attributable to the United States, while the remaining revenue is primarily attributed to Singapore, Taiwan, and China.[7]

27.     As a wholly owned subsidiary of NVIDIA Corporation, NVIDIA Singapore's revenue is reported as a portion of NVIDIA Corporation's global total revenue based on billing location. During FY 2025, NVIDIA Singapore reported 23.7 billion USD of revenue, comprising roughly 18% of NVIDIA Corporation's revenue. However, NVIDIA Corporation has clarified that NVIDIA Singapore's revenue captures shipments *outside of* Singapore.[8]

28.     In fact, most shipments associated with Singapore revenue were to locations other than Singapore. Shipments to Singapore comprised less than 2% of fiscal year 2025 total revenue for NVIDIA Corporation despite NVIDIA Singapore comprising 18% of NVIDIA Corporation's total revenue based on customer billing location.[9]

29.     On information and belief, NVIDIA Singapore's revenue includes revenue from Accused Products that are sold (directly or indirectly) to U.S.-based customers and/or shipped to the United States. NVIDIA Corporation has reported that over 99% of NVIDIA Singapore's Data Center Compute end market revenue was for orders from U.S.-based customers.[10] Nearly 80% of NVIDIA Corporation's total revenue for FY 2025 is attributable to its Data Center Compute end market, which, on information and belief, includes Accused Products such as the NVIDIA DGX GH200 and NVIDIA GB200 NVL72.[11]

---

[7]    https://www.voronoiapp.com/technology/-Nvidia-Sales-Revenue-by-Geographic-Distribution-20102024-4459

[8]    https://www.whatthechiphappened.com/p/nvidias-singapore-revenue-its-just

[9]    https://www.sec.gov/Archives/edgar/data/1045810/000104581025000023/nvda-20250126.htm

[10]    https://www.sec.gov/Archives/edgar/data/1045810/000104581025000116/nvda-20250427.htm

[11]    https://s201.q4cdn.com/141608511/files/doc_financials/2025/annual/NVIDIA-2025-Annual-Report.pdf

30.    NVIDIA Singapore has not sought to exclude any portion of the United States, including Texas, from its efforts to sell Accused Products ultimately shipped to the United States. Notably, Texas is a major market for high-performance computing (HPC), AI development and data center infrastructure.

31.    NVIDIA Singapore shares common leadership with NVIDIA Corporation, suggesting that NVIDIA Singapore coordinates its strategic priorities with NVIDIA Corporation, which includes targeting Texas as a key product destination for the Accused Products. On information and belief, Rebecca Peters is VP, Assistant Secretary & Deputy General Counsel at NVIDIA Corp., and serves as a Director of NVIDIA Singapore. Donald Robertson, a VP, Chief Accounting Officer at NVIDIA Corp. is a Director of NVIDIA Singapore. Mark Hoose, VP, Global Tax Officer at NVIDIA serves as a Director of NVIDIA Singapore.

32.    This litigation results from injuries that arise out of or relate to the activities engaged in by NVIDIA Singapore.

33.    Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(c)(3) because NVIDIA Singapore is a foreign defendant that may be sued in any judicial district.

34.    In addition, NVIDIA Singapore did not dispute that personal jurisdiction and venue are proper in this District in a case brought in this District earlier this year. *See, e.g., SiliconArts Technology US Inc. v. NVIDIA Corporation et al.,* No. 1:25-cv-00431, Dkt. No. 36.

## FACTUAL ALLEGATIONS

### A. The Asserted Patent

35.    On April 8, 2014, the United States Patent and Trademark Office duly issued U.S. Patent 8,694,704, entitled "METHOD AND APPARATUS FOR CONGESTION-AWARE ROUTING IN A COMPUTER INTERCONNECTION NETWORK." A true and correct copy of

the '704 Patent is attached hereto as **Exhibit A**.

36.    The inventors of the '704 Patent were researchers at the University of Texas, and assigned all of their right, title and interest in and to the '704 Patent to the Board of Regents of the University of Texas Systems, which remains the owner of the '704 Patent today.

37.    Plaintiff's predecessor, IDMC, financially and otherwise promoted and enabled the innovation and patenting that led to the '704 Patent. Partially in recognition of those contributions, The Board of Regents of the University of Texas System granted an exclusive license under the '704 Patent (along with many other patents) to IDMC. Specifically, the Board of Regents of the University of Texas System granted an exclusive license that transfers all substantial rights in, to and under, *inter alia,* the '704 Patent to IDMC pursuant to a License Agreement effective as of August 26, 2008, including the right to "causes of action and enforcement rights of any kind (whether such claims, causes of action or enforcement rights are known or unknown; currently pending, filed, to be filed; or otherwise) under the Patents and/or under or on account of any of the Patents for past, current and future infringement of the Patents, including without limitation, all rights to (i) pursue and collect damages, profits and awards of whatever nature recoverable. . ." in § 1.3(b) and in §5.2  "all substantial rights under the Patents and, as a result, Licensee has the right to bring any future action or proceeding to enforce claims under the Patents in its own name, without naming Licensor as a party thereto."

38.    IDMC then assigned the License Agreement and all rights and obligations under the agreement to its affiliate, Empire. Therefore, Plaintiff has the exclusive right to take all actions necessary to enforce the '704 Patent, including the filing of this patent infringement lawsuit. Empire has the right to seek and recover all damages for past, present, and future infringement of the Asserted Patent and to seek injunctive relief as appropriate under the law.

39.    To the extent applicable, Plaintiff has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the '704 Patent. Upon information and belief, all owner(s) and licensee(s) of the '704 Patent—past and present—have also complied with the marking provisions of 35 U.S.C. § 287. Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '704 Patent.

**B. Development and History of Multi-Nodal Processors**

40.    Multi-nodal processors are the driving force behind today's AI revolution, forming the foundational architecture of the data centers that power the world's most complex AI training models. These specialized processors contain thousands of cores designed for the parallel operations essential to AI computing. Their power and efficiency are critical to meeting the massive demands of training and deploying modern AI systems. Without high-performance AI CPUs and GPUs, large-scale model development would be infeasible due to time, energy, and cost constraints. Advancing and controlling GPU and CPU technology is, therefore, central to leadership in the AI sector.

41.    The development of multi-nodal processors was fueled by limits in traditional monolithic processor design. Legacy processors were overcome by slow scaling, lower yields, and thermal and power constraints. Innovators were faced with a challenge to build a design that could accommodate more expansive processing while retaining the small architecture required for applications of CPUs. To accommodate larger scale processing, functions were disaggregated across multiple dies, or nodes, giving rise to multi-nodal processors.

**C. The Inventors**

42.    The trio of engineers at the University of Texas, and inventors to the '704 Patent,

anticipated the pivotal role that multi-nodal processors would play in the future of high-throughput computing, which now forms the backbone of modern AI systems.

43.    On information and belief, Dr. Grot's scholarship into the world of computer architecture began at The University of Texas at Austin, where he completed a Ph.D. in Computer Science. There, his research focused on the challenges of scaling on-chip networks and ensuring quality-of-service in densely integrated processors — a topic that played a pivotal role in the development of the '704 Patent.

44.    On information and belief, Dr. Gratz is a faculty member in the Department of Electrical and Computer Engineering at Texas A&M University. He earned his Ph.D. from The University of Texas at Austin in 2008 alongside Dr. Grot, after completing his B.S. and M.S. degrees at the University of Florida. Prior to academia, he worked as a design engineer at Intel from 1997 to 2002. Professor Gratz is also an award-winning educator, honored with the Texas A&M Distinguished Achievement Award in Teaching in 2016 and the College of Engineering Excellence Award in 2017.

45.    Dr. Keckler works in computer architecture, currently heading the Architecture Research Group at NVIDIA, where he explores the future of high-performance computing systems. His academic journey began with a B.S. in Electrical Engineering from Stanford University, followed by an M.S. and Ph.D. in Computer Science from the Massachusetts Institute of Technology. From 1998 to 2012, Dr. Keckler was a professor at The University of Texas at Austin, where he mentored students, including Dr. Grot and Dr. Gratz, and conducted pioneering research in parallel and high-performance computing which ultimately contributed to the '704 Patent. On information and belief, Dr. Keckler continues to serve as an Adjunct Professor of Computer Science at the University of Texas at Austin today.

### D. Development of the Patented Technology

46.     Prior to the development of the '704 Patent's claimed invention, multi-nodal processors had only local awareness and made decisions based on immediate, nearby conditions without considering the state of the broader node system. While this worked for smaller systems, it led to inefficient data routing and bottlenecks in large-scale AI systems, as each multi-nodal processor was effectively "flying blind" beyond its local view.

47.     In contrast, the invention claimed in the '704 patent introduced both local and regional awareness, allowing multi-nodal processors to assess congestion across the system, and make smarter, coordinated decisions that avoid hot spots and improve overall throughput and scalability.

48.     The '704 Patent's claimed invention is especially important for AI because it solved major bottleneck issues in large-scale computing. The system-wide congestion awareness introduced in the '704 Patent fundamentally transformed multi-nodal processors. This novel technology allows multi-nodal processors to monitor data traffic, reroute data through less-busy pathways, and balance loads to optimize performance. Therefore, data can flow smoothly across large computing networks, allowing AI models to train faster, scale bigger, and ultimately run more efficiently. Without the invention of the '704 patent, even the most powerful multi-nodal processors would be hindered by communication delays. Thus, the '704 invention did not just make AI faster, it made modern AI, covering hundreds of billions of parameters, possible.

49.     The inventions described in the '704 Patent improve the functioning of computer processors. The '704 Patent explains that in multi-nodal processing, data is distributed to processing nodes. However, existing routing procedures did not efficiently route the data between the various processing nodes. Some networks would route data packets following a fixed,

predetermined path, completely unaware of network congestion and unable to adapt to changes in the network. '704 Patent at 3:22-30. Other networks would route around congested areas of the network using "local congestion information (e.g., information readily available at a given router and at routers directly coupled to a given router)". *Id.,* 3:31-44.

50.    The '704 Patent describes methods and apparatus for congestion-aware routing in multi-nodal processors that account for non-local status information and improve overall efficiency. Further, experiments performed by the inventors demonstrated significant performance advantages of the invention over the performance of conventional adaptive routing. Accordingly, the '704 Patent describes new and useful patent-eligible technological improvements to the functioning of computer systems, and muti-nodal processors in particular. Likewise, the claimed invention and features were not routine and conventional but rather provided significant efficiency gains over conventional routing technologies.

51.    The efficiency gains made possible by the inventions claimed in the '704 Patent have become increasingly important in the modern computing age, where multi-nodal adaptive routing processors have become the backbone of AI, powering the data centers behind today's most advanced training models.

### COUNT I: INFRINGEMENT OF THE '704 PATENT

52.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

**Direct Infringement**

53.    Plaintiff has not licensed or otherwise authorized Defendants to make, use, offer for sale, sell, or import any products that embody the inventions of the '704 Patent.

54.    In violation of 35 U.S.C. § 271, Defendants have and continue to directly infringe

the Asserted Patent either literally or under the doctrine of equivalents by making, using, selling, offering for sale, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the Asserted Patent.

55.    By facilitating these sales and deliveries in the United States, including in this District, Defendants engage in infringing acts within the meaning of 35 U.S.C. § 271(a).

56.    For example, Defendants have and continue to directly infringe at least Claim 10 of the '704 Patent, literally and/or pursuant to the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States the NVIDIA Grace CPU, among other products.[12]

57.    The NVIDIA Grace CPU is an apparatus:[13]



58.    The NVIDIA Grace CPU comprises a first node of a network-on-chip of a multi-nodal processor, the first node comprising a first plurality of output channels to provide first data

---

[12] The images used herein come from publicly available materials, including marketing materials, and may not fully represent the nuances of the architectures of the Accused Products. Images used in this Complaint and labeling thereon is meant to be demonstrative, not limiting.

[13] https://www.nvidia.com/en-us/data-center/grace-cpu/.

and a first processor unit configured to perform processing tasks:[14]



**Arm Neoverse V2 cores**

Even as the parallel compute capabilities of GPUs continue to advance, workloads can still be gated by serial tasks run on the CPU. For maximum workload acceleration, a fast and efficient CPU core is critical to system design.

At the heart of the NVIDIA Grace CPU are the Arm Neoverse V2 CPU cores. Neoverse V2 cores are optimized to deliver industry-leading performance per thread while also providing exceptional energy efficiency compared to traditional CPUs.

The NVIDIA Grace CPU Superchip integrates up to 144 high-performance Arm Neoverse V2 cores with a Scalable Vector Extension version 2 (SVE2) 4x128b single-instruction, multiple-data (SIMD) pipeline per core to deliver 2x the data center performance efficiency of the latest-generation x86 servers.

---

[14]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf (image annotated); https://developer.nvidia.com/blog/revolutionizing-data-center-efficiency-with-the-nvidia-grace-family/ (image annotated).



*Figure 4. NVIDIA Grace CPU and the NVIDIA SCF*

59.    The NVIDIA Grace CPU comprises a second node of the network-on-chip of the multi-nodal processor, the second node comprising a second plurality of output channels to provide second data and a second processor unit configured to perform processing tasks, the second node further comprising a router device configured to route the second data:[15]

---

[15]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf (image annotated).



60.    The NVIDIA Grace CPU comprises a third node of the network-on-chip of the multi-nodal processor, the third node coupled directly to the first node via a first connection:[16]



---

[16] *Id.* (image annotated).

61.    Further, on information and belief, the NVIDIA Grace CPU, via the first connection, receives the first data and via a second connection receives non-local status information corresponding to the first node:[17]

> NVIDIA Grace CPU simplifies the design of energy-efficient systems to deliver greater data center-scale performance. The Grace CPU combines 72 high-performance and power-efficient Arm Neoverse V2 cores, connected with the NVIDIA Scalable Coherency Fabric (SCF) that delivers 3.2TB/s of bisection bandwidth—double that of traditional CPUs. This architecture keeps data flowing between CPU cores, cache, memory, and system input and output (IO) to get the most out of the system's performance. This architecture provides good locality to data and memory, making the platform easy to optimize for developers.

### NVIDIA Scalable Coherency Fabric

A key challenge is ensuring that all cores, cache, memory, and high-speed system I/Os don't have bottlenecks to get the most out of the architecture. NVIDIA Scalable Coherency Fabric (SCF) (Figure 4) is a mesh fabric and distributed cache architecture designed by NVIDIA to meet those challenges to scale cores and bandwidth in a power–and area-efficient manner.

NVIDIA SCF also enables memory coherency between another NVIDIA Grace CPU in a Superchip configuration or with a GPU in an NVIDIA Grace Hopper or NVIDIA Grace Blackwell configuration.

The CPU cores and SCF cache partitions are distributed throughout the mesh, while cache switch nodes route data through the fabric and serve as interfaces between the CPU, cache memory, and system I/Os.

SCF provides over 3.2 TB/s of total bisection bandwidth to keep data flowing between the CPU cores, NVLink-C2C, memory, and system I/O. The SCF reduces bottlenecks in data movement-heavy applications, such as graph analytics where NVIDIA Grace delivers up to 2x the performance of leading x86 servers.



*Figure 4. NVIDIA Grace CPU and the NVIDIA SCF*

62.    For example, on information and belief the NVIDIA Grace CPU communicates local status information using CBusy, Hot Spot Re-Routing, and/or other congestion-aware

---

[17] https://resources.nvidia.com/en-us-grace-cpu/data-center-datasheet?ncid=no- ncid; https://developer.nvidia.com/blog/revolutionizing-data-center-efficiency-with-the-nvidia-grace-family/.

techniques:[18]



63.     The NVIDIA Grace CPU comprises a third node of the network-on-chip of the multi-nodal processor. On information and belief, the third node is further directly coupled to the second node via a third connection to receive the second data and via a fourth connection to receive non-local status information corresponding to the second node, wherein the first node is indirectly

---

[18] https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/neoverse-v1-platform-a-new-performance-tier-for-arm;
https://fuse.wikichip.org/news/5006/the-mesh-network-for-next-generation-neoverse-chips/.

coupled to the second node via the third node:[19]





64.    The NVIDIA Grace CPU comprises a third node of the network-on-chip of the multi-nodal processor, the third node comprising a third processor unit configured to perform

[19]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf (image annotated);
https://fuse.wikichip.org/news/5006/the-mesh-network-for-next-generation-neoverse-chips/.

processing tasks:[20]





Figure 4. NVIDIA Grace CPU and the NVIDIA SCF

---

[20]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf                    (image                    annotated);
https://developer.nvidia.com/blog/revolutionizing-data-center-efficiency-with-the-nvidia-grace-family/.

**Arm Neoverse V2 cores**

Even as the parallel compute capabilities of GPUs continue to
advance, workloads can still be gated by serial tasks run on the CPU.
For maximum workload acceleration, a fast and efficient CPU core is
critical to system design.

At the heart of the NVIDIA Grace CPU are the Arm Neoverse V2 CPU
cores. Neoverse V2 cores are optimized to deliver industry-leading
performance per thread while also providing exceptional energy
efficiency compared to traditional CPUs.

The NVIDIA Grace CPU Superchip integrates up to 144 high-
performance Arm Neoverse V2 cores with a Scalable Vector Extension
version 2 (SVE2) 4x128b single-instruction, multiple-data (SIMD)
pipeline per core to deliver 2x the data center performance efficiency
of the latest-generation x86 servers.

65.    The NVIDIA Grace CPU comprises a third node of the network-on-chip of the
multi-nodal processor, the third node further comprising a third plurality of output channels to
provide third data:[21]

---

[21]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2
022.NVIDIA%20Grace.JonathonEvans.v5.pdf (image annotated).



66.    The NVIDIA Grace CPU's third node further comprises a local status unit configured to provide first local status information regarding congestion for each of the third plurality of output channels. As an example, the third node includes a transaction completer node, (akin to a Home Node, as discussed below), that is configured to provide a CBusy indication or other indication of local status regarding congestion.

67.    The NVIDIA Grace CPU uses Arm Neoverse™ V2 cores and NVIDIA's proprietary Scalable Coherency Fabric (SCF). On information and belief, NVIDIA's SCF is a highly customized version of the Arm® Neoverse™ CMN-700 Coherent Mesh Network, or is otherwise based on CMN-700.



**Boost Performance and Efficiency With Arm Cores and NVIDIA SCF**

NVIDIA Grace uses high-performance Arm Neoverse™ V2 cores coupled with NVIDIA Scalable Coherency Fabric (SCF) to maximize performance and energy efficiency for data center workloads.

68.    Notably, CMN-700 includes Home Nodes and Request Nodes. This terminology is used below for ease of reference.[22]





---

[22]    *Id.*    (image    annotated);    https://fuse.wikichip.org/news/5006/the-mesh-network-for-next-generation-neoverse-chips/;    https://www.anandtech.com/show/16640/arm-announces-neoverse-v1-n2-platforms-cpus-cmn700-mesh/7;    https://developer.nvidia.com/blog/nvidia-grace-hopper-superchip-architecture-in-depth/.

69.     On information and belief, the NVIDIA Grace CPU's third node further comprises an aggregation unit configured to combine the non-local status information corresponding to the first node and the first local status information to produce first aggregate status information. For example, the third node includes a Home Node that receives CBusy indication from a Subordinate Node, then "propagate[s]" the CBusy value of the Subordinate node to a Request Node. [23]





[23]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf                (image                annotated);
https://fuse.wikichip.org/news/5006/the-mesh-network-for-next-generation-neoverse-chips/.

70.    On information and belief, the NVIDIA Grace CPU's third node is further configured to provide the non-local status information corresponding to the first node and the first aggregate status information to the second node via the fourth connection: [24]

**HN-F to SN-F CBusy based throttling**

HN-F can identify two groups of memory controllers using a configuration bit for each SN. These groups are known as Group A or Group B. You can use the two groups to identify fast and slow memory types. Therefore, the HN-F can handle traffic to and from the two types independently of each other.

HN-F can track the read and write busyness to each SN-F group over a configurable transaction window. It can be programmed to track the last 128 or 256 transactions. When HN-F has received as many responses from SN-F, it measures the current busyness for each group of SN and request types (read and write). The measured busyness is then used to throttle the traffic to SN-F appropriately.

The threshold for measuring the CBusy for the last 128 or 256 transactions is also configurable. For example, consider a scenario where HN-F is programmed to calculate the last 128 CBusy

---

[24]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf (image annotated); https://community.arm.com/arm-community-blogs/b/architectures-and-processors-blog/posts/neoverse-v1-platform-a-new-performance-tier-for-arm); https://hc33.hotchips.org/assets/program/conference/day1/20210818_Hotchips_NeoverseN2.pdf.



71.     On information and belief, the second node is configured to route second data based on the first aggregate status information. For example, on information and belief, the second node (e.g., the Request Node/Core of the second node) is informed via the CBusy indication as to the busyness of a Subordinate Node. The Core can choose to route subsequent requests to the Subordinate Node or can choose to route subsequent requests to a different Subordinate Node.[25]

---

[25]https://www.hc34.hotchips.org/assets/program/conference/day2/ADAS%20and%20Grace/HC2022.NVIDIA%20Grace.JonathonEvans.v5.pdf (image annotated); https://resources.nvidia.com/en-us-grace-cpu/data-center-datasheet?ncid=no- ncid.; https://developer.nvidia.com/blog/revolutionizing-data-center-efficiency-with-the-nvidia-grace-family/; https://fuse.wikichip.org/news/5006/the-mesh-network-for-next-generation-neoverse-chips/; https://resources.nvidia.com/en-us-grace-cpu/nvidia-grace-cpu-superchip#page=1?ncid=no-ncid.



NVIDIA Grace CPU simplifies the design of energy-efficient systems to deliver greater data center-scale performance. The Grace CPU combines 72 high-performance and power-efficient Arm Neoverse V2 cores, connected with the NVIDIA Scalable Coherency Fabric (SCF) that delivers 3.2TB/s of bisection bandwidth—double that of traditional CPUs. This architecture keeps data flowing between CPU cores, cache, memory, and system input and output (IO) to get the most out of the system's performance. This architecture provides good locality to data and memory, making the platform easy to optimize for developers.

## NVIDIA Scalable Coherency Fabric

A key challenge is ensuring that all cores, cache, memory, and high-speed system I/Os don't have bottlenecks to get the most out of the architecture. NVIDIA Scalable Coherency Fabric (SCF) (Figure 4) is a mesh fabric and distributed cache architecture designed by NVIDIA to meet those challenges to scale cores and bandwidth in a power– and area-efficient manner.

NVIDIA SCF also enables memory coherency between another NVIDIA Grace CPU in a Superchip configuration or with a GPU in an NVIDIA Grace Hopper or NVIDIA Grace Blackwell configuration.

The CPU cores and SCF cache partitions are distributed throughout the mesh, while cache switch nodes route data through the fabric and serve as interfaces between the CPU, cache memory, and system I/Os.

SCF provides over 3.2 TB/s of total bisection bandwidth to keep data flowing between the CPU cores, NVLink-C2C, memory, and system I/O. The SCF reduces bottlenecks in data movement-heavy applications, such as graph analytics where NVIDIA Grace delivers up to 2x the performance of leading x86 servers.



*Figure 4. NVIDIA Grace CPU and the NVIDIA SCF*



As noted in the V1 system features, CBusy is a new CPU-Mesh feature to alleviate mesh traffic congestions under high load, varying the CPU's traffic requirements. There's also general traffic improvements such as combining operations to reduce operations, or straightforward operations such as data-less writes to pages (Writing a page to all 0's can be done with only one transaction, instead of writing zero to each cache line).

72.     On information and belief, Defendants import the Accused Products into the United States for sale via NVIDIA's website and/or offer the Accused Product for sale directly to individuals in the United States, including in this District, through its website. NVIDIA's U.S. marketplace also includes a range of infringing NVIDIA-partner products featuring Grace CPUs.

These include Dell Pro Max with GB10, HP ZGX Nano AI Station, and Lenovo ThinkStation.[26] NVIDIA directs consumers on how to purchase these products from partners, for example, to "Reserve Now" or "Reserve from Partner."



73.     At least some of NVIDIA customers alternatively purchase Accused Products indirectly through multiple OEMs, ODMs, system integrators, distributors, and other channel partners.

74.     On information and belief, NVIDIA also has indirect customers who purchase products through NVIDIA's direct customers. Indirect customers include cloud service providers, consumer internet companies, enterprises, and public sector entities, for example.

---

[26]https://marketplace.nvidia.com/en-us/enterprise/laptops-workstations/?category=ai_super_computer&page=1&limit=15

**Indirect Infringement**

75.     Defendants have actual knowledge of the '704 Patent, and its infringement thereof described above, at least as of the date of filing of this Complaint.

76.     In violation of 35 U.S.C. § 271(b), Defendants have and continue to infringe one or more of the '704 Patent's claims, including at least Claim 10, indirectly by knowingly and intentionally inducing others, such as NVIDIA's customers and end-users to directly infringe either literally or under the doctrine of equivalents. For example, NVIDIA's customers and/or end-users directly infringe via their use of the Accused Products and/or their manufacture, use, sales, and/or offers for sale in the United States and/or importation into the United States of other products that incorporate the Accused Products in manners that infringe the '704 Patent, including at least Claim 10.

77.     On information and belief, NVIDIA furnishes instructive materials, technical support, and information concerning the operation and use of the Accused Products and markets and advertises such products on its website, in videos, at conferences, and elsewhere to induce third parties, including NVIDIA's customers and/or end-users to use the Accused Products, and/or to make, use, sell, and/or offer for sale in the United States and/or import into the United States other products incorporating the Accused Products in manners that would infringe one or more of the claims of the '704 Patent, including at least Claim 10. Defendants encourage their retail partners to import, offer for sale, and/or sell Accused Products to customers in the United States. On information and belief, NVIDIA provides marketing materials and technical documentation to these retailers to facilitate their sales efforts, knowing that the resulting transactions involve infringing use of the patented technology by customers in the United States, including in this District.

78.    At a minimum, Defendants have actual notice of the '704 Patent since the filing of this Complaint. Further, on information and belief and by virtue of its employment of Dr. Keckler as Vice President of its Architecture Research group, NVIDIA has had knowledge of the inventions claimed in the '704 Patent since at least its issue date (April 4, 2014). On information and belief, NVIDIA was therefore aware of (or willfully blind to) its infringement of the '704 Patent at least as early as the first release date for any Accused Product, at least as early as Q1 2023.

79.    In violation of 35 U.S.C. § 271(c), Defendants are and have been infringing one or more of the '704 Patent's claims, including at least Claim 10, indirectly by contributing to the direct infringement committed by others, such as NVIDIA's customers and end-users, in this District and elsewhere in the United States. For example, NVIDIA's customers and/or end-users directly infringe via their use of the Accused Products in the United States, and/or their manufacture, use, sales, and/or offers for sale in the United States and/or importation into the United States of other products that incorporate the Accused Products in manners that infringe the '704 Patent, including at least Claim 10.

80.    On information and belief, Defendants make and sell hardware and/or software components especially made or especially adapted to practice the invention claimed in the '704 Patent, including at least Claim 10, and that (i) is a material part of the invention and (ii) is not a staple article or commodity of commerce suitable for substantial non-infringing use at least because it is specifically designed to perform the claimed functionality. Any other use of such hardware and/or software would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

81.    On information and belief, Defendants supply hardware, firmware, and/or software,

including software drivers, that are especially made or especially adapted to practice the inventions claimed in the '704 Patent, including at least Claim 10, to induce third parties, including for example NVIDIA's customers and/or end-users, to use the Accused Products in the United States, and/or to make, use, sell, and/or offer for sale in the United States and/or import into the United States other products incorporating the Accused Products in manners that would infringe one or more of the claims of the '704 Patent, including at least Claim 10.

**Willful Infringement**

82.     Defendant incorporates by reference the allegations of Paragraph 78 and therefore alleges that Defendants' infringement of the '704 Patent is willful, entitling Empire to increased damages pursuant to 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## DAMAGES

83.     Defendants' acts of infringement have caused damages to Empire, and Empire is entitled to recover from Defendants the damages it has sustained as a result of Defendants' wrongful acts in an amount to be determined at trial.

84.     Plaintiff is entitled to, and now seeks to, recover damages in an amount not less than the maximum amount permitted by law caused by Defendants' acts of infringement, including for damages arising before the filing of the Complaint and an ongoing royalty, and, in any case, no less than a reasonable royalty, pursuant to 35 U.S.C. § 284, together with interest and costs as fixed by the Court.

85.     Defendants' infringement of the '704 Patent is willful and deliberate, justifying treble damages pursuant to 35 U.S.C. § 284.

86.     Empire further seeks any other damages to which it would be entitled to in law or

in equity.

## **PRAYER FOR RELIEF**

87.     WHEREFORE, Empire prays for judgment and requests that the Court find in its favor and against Defendants. Plaintiff respectfully requests that the Court enter preliminary and final orders, declarations, and judgments against Defendants as are necessary to provide Empire with the following relief:

a.  A judgment that Defendants have infringed and/or are infringing one or more claims of the Asserted Patent, literally or under the doctrine of equivalents, and directly or indirectly, as alleged above;

b.  A judgment that Defendants' infringement of the claims of the Asserted Patent has been willful;

c.  An award for all damages and costs arising out of Defendant's infringement, to adequately compensate Empire for Defendants' infringement of the Asserted Patent, but in no event less than a reasonable royalty, including an accounting of damages up to any verdict as well as supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed;

d.  Pre-judgment and post-judgment interest, jointly and severally, in an amount according to proof;

e.  Treble damages based on Defendants' willful infringement;

f.  An accounting of damages and any future compensation due to Empire for Defendants' infringement (past, present, or future) not specifically accounted for in a damages award (or other relief), and/or permanent injunctive relief;

g.  A judgment that this case is exceptional and an award of reasonable attorneys' fees as

provided by 35 U.S.C. § 285 and enhanced damages as provided by 35 U.S.C. § 284;

h.  An award of costs of suit;

i.  All further relief in law or in equity as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

88.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Empire demands a trial by jury on all issues so triable.

Dated: August 6, 2025                    Respectfully submitted,


By: */s/ Deron R. Dacus*
Deron R. Dacus
State Bar No.  00790553
**The Dacus Firm, P.C.**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1117
ddacus@dacusfirm.com

Adam P. Seitz
Carrie A. Bader
Lydia Raw
ERISE IP, P.A.
7015 College Boulevard, Ste. 700
Overland Park, KS 66211
Telephone: (913) 777-5600
Fax: (913)777-5601
Adam.seitz@eriseip.com
Carrie.bader@eriseip.com
Lydia.raw@eriseip.com

Christina Canino (pro hac vice forthcoming)
ERISE IP, P.A.
717 17th Street
Suite 1400
Denver, CO 80202
Telephone: (720) 689-0679
Christina.canino@eriseip.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via electronic mail on August 6, 2025.

*/s/ Deron R. Dacus*